FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

10/30/26

SEAN F. MCAVOY, CLERK

# UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WASHINGTON

**HAYLEY PHILLIPS,**

Plaintiff,

v.

**WASTE TREATMENT COMPLETION COMPANY, LLC,**

a Delaware limited liability company;

**BECHTEL NATIONAL, INC.,**

a Delaware corporation;

**and AMENTUM HOLDINGS, INC.**

a Delaware corporation,

Defendants.

) Case No. 4:26-cv-05180-MKD

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Plaintiff Hayley Phillips ("Ms. Phillips" or "Plaintiff"), by and through her attorneys of record, hereby files this Complaint against Defendants Waste Treatment Completion Company, LLC ("WTCC"), Bechtel National, Inc.

("Bechtel"), and Amentum Holdings, Inc. ("Amentum") (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. This is an action for whistleblower retaliation and wrongful discharge. Ms. Phillips was employed as the Employee Concerns Program ("ECP") Coordinator for WTCC, a subsidiary of Bechtel, at the United States Department of Energy's ("DOE") Hanford Site in Richland, Washington—a government-owned, contractor-operated nuclear waste treatment facility. Ms. Phillips made multiple protected disclosures to her superiors regarding fraud, waste, abuse of authority, gross mismanagement, violations of federal law and DOE Orders, and threats to employee and public safety. In direct retaliation for these protected disclosures, Defendants terminated Ms. Phillips's employment on November 1, 2023.

2. Ms. Phillips's disclosures included, among other things: (a) reporting to management that WTCC General Counsel Sandra Fowler was intentionally interfering with ECP investigations and failing to report substantiated findings of waste, fraud, and abuse to the DOE Office of Inspector General ("OIG") as required by DOE Order 221.1A; (b) disclosing that senior management was undermining, suppressing, and retaliating against the WTCC ECP function; (c) reporting substantiated timecard fraud that senior management sought to suppress;

(d) reporting failures to implement ECP recommendations addressing safety and harassment concerns; and (e) disclosing concerns regarding a flawed and biased investigation that was used as a pretext for her termination.

3. Defendants' stated reason for terminating Ms. Phillips—that she allegedly breached confidentiality and misled investigators—is pretextual. The investigation that purportedly led to her termination was conducted by WTP ECP Manager Dan Mendoza, whose conduct and bias Ms. Phillips had specifically reported to management just two days before the investigation commenced. The investigation was procedurally flawed, relied on unreliable hearsay, and was aided by individuals about whom Ms. Phillips had raised concerns—creating an impermissible conflict of interest.

## II. PARTIES

4. Plaintiff Hayley Phillips is a natural person and citizen of the State of Washington residing in West Richland, Benton County, Washington.

5. Defendant Waste Treatment Completion Company, LLC ("WTCC") is a limited liability company organized under the laws of Delaware. WTCC was created in 2017 by Bechtel National, Inc. ("Bechtel") and AECOM Energy & Construction, Inc. and is currently jointly owned by Bechtel and Amentum Holdings, Inc. ("Amentum"). WTCC is the entity responsible for completing the

WTP for processing radioactive waste at the DOE Hanford Site. At all times relevant hereto, WTCC was Ms. Phillips's direct employer. Bechtel was the prime contractor to DOE, and WTCC performed work under a subcontract with Bechtel. Amentum's alleged responsibility as a parent company and/or joint employer is based on its ownership and contractual arrangements with WTCC, which are addressed separately below.

6. Under the WTP Contract, "the parent companies shall assume joint and several liability for the performance of the Contractor." During the time period relevant to this Complaint, WTCC was owned by Bechtel National, Inc. ("Bechtel"), a wholly-owned subsidiary of Bechtel Corporation, and Amentum Holdings, Inc. ("Amentum"). Plaintiff alleges that these ownership and contractual arrangements, together with each entity's actual control over her employment, support their inclusion as defendants. The precise corporate, contractual, and employer relationships are subject to confirmation through the governing contracts and discovery.

7. Defendant Bechtel National, Inc. ("Bechtel") is a corporation organized and existing under the laws of Delaware. Bechtel was the prime contractor to the United States Department of Energy for the design and construction of the Hanford Tank Waste Treatment and Immobilization Plant ("WTP") at the DOE Hanford Site in Richland, Washington, and was a parent company of WTCC. Bechtel also

acted as Ms. Phillips's functional employer and participated in the decision to terminate her.

8. Defendant Amentum Holdings, Inc. ("Amentum") is a corporation organized and existing under the laws of Delaware. During the relevant period, Amentum was a parent company and co-owner of WTCC. Separately, Amentum performed work at the Hanford Site as a subcontractor to Bechtel and employed personnel whose work was involved in matters investigated by WTCC ECP. Plaintiff alleges that Amentum's ownership, contractual role, and actual control support its liability; the precise basis and extent of any employer relationship are subject to confirmation from the governing agreements and discovery.

## III. JURISDICTION AND VENUE

9. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiff's claim arising under 31 U.S.C. § 3730(h), the federal False Claims Act anti-retaliation provisions, and 41 U.S.C. § 4712, the federal whistleblower protection statute applicable to employees of contractors, subcontractors, grantees, and sub-grantees of the federal government. Under 41 U.S.C. § 4712(c)(1), having exhausted her administrative remedies or, alternatively, pursuant to 41 U.S.C. § 4712(c)(2), Ms. Phillips brings this action in the appropriate United States District Court.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state law claim for wrongful discharge in violation of public policy, as it arises from the same nucleus of operative facts as Plaintiff's federal claim.

11. Venue is proper in the Eastern District of Washington pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred at the DOE Hanford Site in Benton County, Washington, which lies within this judicial district, and Defendants conduct business in this district.

## IV. FACTUAL ALLEGATIONS

### A. Ms. Phillips's Employment History and Role

12. In January 2019, WTCC hired Ms. Phillips as an Administrative Specialist at the Hanford Site. She held various positions within WTCC, including Administrative Assistant to the WTCC Site Director, Rick Holmes.

13. In approximately August 2022, based on Mr. Holmes's recommendation and her demonstrated performance, Ms. Phillips expressed interest in a newly created position within the WTCC Employee Concerns Program. Mr. Holmes stated he believed she would be "an asset to the program."

14. In October 2022, Ms. Phillips was officially hired as the WTCC Employee

Concerns Program Coordinator, reporting directly to Brigitte Miller, the WTCC ECP Manager.

15. Ms. Phillips's duties as ECP Coordinator included scheduling meetings, managing communications, performing intake interviews for employee concerns, entering data in the Bechtel Case Management System ("BCMS"), fielding questions, accompanying investigators, assisting with investigations, and training to become an ECP investigator.

16. The WTCC ECP was a sub-organization of the Waste Treatment and Immobilization Plant Employee Concerns Program ("WTP ECP"), which provided oversight to WTCC ECP. WTCC ECP was responsible for receiving and addressing employee concerns raised by WTCC employees at the Hanford Site.

17. Throughout her employment, Ms. Phillips received positive performance evaluations,  exceeded expectations in her performance reviews, and never received any coaching, counseling, or disciplinary action of any kind.

## B. <u>The DOE Contractor Employee Concerns Program and Applicable Federal Requirements</u>

18. The DOE Contractor Employee Protection Program, codified at 10 C.F.R. Part 708, was established to safeguard public and employee health and safety, ensure compliance with applicable laws, rules, and regulations, and prevent fraud,

mismanagement, waste, and abuse at DOE's government-owned, contractor-operated facilities. Its primary purpose is to encourage contractor employees to disclose information regarding unsafe, illegal, fraudulent, or wasteful practices and to protect those employees from retaliation.

19. Under DOE Order 221.1A, DOE contractors are required to report substantiated findings of waste, fraud, and abuse to the DOE Office of Inspector General.

20. Under DOE Order 442.1B, ECP programs must maintain relevant records and ensure that employee concerns are properly processed and documented.

21. DOE O 442.1 B establishes the criteria and processes to maintain a consistent ECP across DOE, including the National Nuclear Security Administration (NNSA), that encourages the free and open expression of employee concerns; provides DOE/NNSA federal, contractor, and subcontractor employees with an independent and formal avenue to raise employee concerns; and supports a safety culture where employee concerns can be promptly identified and resolved without fear of retaliation/reprisal. DOE O 442.1 B defines an employee concern as a good faith expression by a current DOE/NNSA federal,

contractor or subcontractor employee, that an activity, policy, or practice of DOE or one of its contractors or subcontractors-including but not limited to concerns related to the environment, safety, health, security, quality, and management of DOE facilities and operations-should be improved, modified, or terminated, or that the individual has been subjected to harassment, intimidation, retaliation/reprisal or discrimination for raising an employee concern. Under DOE Order 442.1B, ECP programs must maintain relevant records and ensure that employee concerns are properly processed and documented.

22. The work performed at the Hanford Site involves the treatment and processing of radioactive and chemical waste pursuant to contracts funded by the US Government through the DOE. Defendants are contractors and subcontractors performing work under these federal contracts:

a. The Department of Energy's prime contract with Bechtel, Contract No. DE-AC27-01RV14136; and

b. The subcontract between Bechtel and WTCC for on-site work at the Hanford Site's WTP (the "WTCC Contract"). Amentum's role as a parent/co-owner of WTCC is distinct from any role it separately held as a subcontractor performing work under the Bechtel prime contract.

## C. Ms. Phillips's Protected Disclosures

***Disclosure 1: September 12, 2023 — Disclosures to Functional Manager Matthew Curtis***

23. On September 12, 2023, Ms. Phillips and her colleague Derek White met with Matthew Curtis, Bechtel's Manager of Ethics and Compliance and Employee Concerns (Ms. Phillips's Functional Manager), at the BNI main office in Richland, Washington

24. During this meeting, Ms. Phillips disclosed the following concerns:

a. That Heather McMurdo, Nuclear Safety and Quality Culture and ECP Ethics and Compliance Manager for WTP (former Waste Treatment and Immobilization Plant Project (WTP) ECP Manager), and Dan Mendoza, WTP ECP Manager, had presented false information to senior management and DOE officials during an August 2023 presentation concerning the annual Nuclear Safety and Quality Culture ("NSQC") Independent External Assessment. Specifically, Ms. McMurdo's presentation misrepresented a WTCC ECP investigation, making it appear as though WTCC ECP had taken little or no action on employee complaints when in fact the concerns had been investigated, substantiated, and recommendations issued.

b. That Ms. McMurdo was conducting follow-up interviews with WTCC employees who had been interviewed during the NSQC assessment process, which subjected at least one employee to retaliation and interfered with WTCC ECP's ongoing investigations.

c. That Ms. McMurdo had asked the WTP Security Manager to inform her whenever WTCC ECP began investigating matters involving contracted security officers, constituting improper interference with the ECP function.

d. That WTP ECP was contacting WTCC employees directly to conduct interviews without first informing WTCC ECP, in violation of established procedures.

e. That Ms. McMurdo, Mr. Mendoza, and other senior management did not support WTCC ECP and were actively impeding WTCC ECP's cases and concerns. That Ms. Phillips attended meetings and was included in email communications in which these senior managers made statements to undermine concerns that WTCC ECP substantiated.

f. That WTCC General Counsel Sandra Fowler was intentionally interfering with WTCC ECP investigations and failing to report substantiated employee concerns regarding waste, fraud, and abuse to the DOE Inspector General as required by DOE Order 221.1A.

g. That Ms. Phillips and other WTCC ECP employees, including WTCC ECP Manager Brigitte Miller, were being bullied and pressured by senior management not to investigate certain concerns.

h. That Ms. McMurdo and Mr. Mendoza failed to provide any constructive or appropriate oversite to WTCC ECP. In fact, Mr. Mendoza had a notorious reputation for exclusively contacting WTCC ECP employees to assign fault for perceived mistakes. That as a result of Ms. Phillips's experience with Ms. McMurdo and Mr. Mendoza, she did not trust their ability to provide unbiased and fair guidance on WTCC ECP investigations.

i. That organizations on the project routinely disagreed with WTCC ECP's substantiated findings and refused to implement recommendations.

25. Ms. Phillips and Mr. White provided Mr. Curtis with a written document titled "Concerns Regarding Interference with WTCC ECP" memorializing these disclosures. Over the following weeks, Ms. Phillips also emailed Mr. Curtis additional supporting documentation.

26. Mr. Curtis acknowledged receipt but took no corrective action. He later informed Ms. Phillips that corporate was "not in a position to make any changes" regarding the concerns she and Mr. White had reported.

***Disclosure 2: Violations of DOE Order 221.1A — Reporting Requirements***

27. In the course of her duties and in communications with management, Ms. Phillips disclosed multiple instances where employee concerns about waste, fraud, and abuse were substantiated by the WTCC ECP but not reported to the DOE Inspector General as required by DOE Order 221.1A. These disclosures were made to Mr. Curtis on September 12, 2023, and verbally to Compliance Auditor April Stephenson in the June through August 2023 timeframe.

28. Specifically, Ms. Phillips reported:

a. That WTCC ECP had investigated and substantiated multiple instances of timecard fraud, but WTCC General Counsel Sandra Fowler failed to report these substantiated findings to the DOE OIG as required. In a meeting on or about October 10, 2023, Ms. Fowler admitted that the OIG had not been informed of recently completed and substantiated timecard fraud cases.

b. That Ms. Fowler was intentionally interfering with ECP investigations by, among other things: instructing managers and Human Resources not to inform the ECP Manager of potential timecard fraud cases; instructing employees to direct concerns to herself to control outcomes; having ECP send draft investigation reports to implicated parties' management chain

without need-to-know basis; and hiring outside legal teams to re-review already completed and substantiated investigations.

c. That in September or October of 2023, Ms. Phillips was shown a Skype message in which Ms. Fowler instructed Matt Rineer, Bechtel Human Resources Manager, to no longer inform ECP of timecard fraud concerns and bring them directly to her in violation of DOE Order 442.1B governing ECP procedures.

d. That there were systematic failures to report credible concerns to the DOE Inspector General.

***Disclosure 3: Late September/Early October 2023 — Reorganization Concerns***

29. In approximately late September or early October 2023, Ms. Phillips raised concerns to Matt Rineer (Bechtel Human Resources Manager), Sandra Fowler (by phone), Larry Brown (WTCC Labor Relations Manager, in person), and Brigitte Miller regarding rumors that WTCC ECP would be eliminated and absorbed by WTP ECP. Ms. Phillips expressed concern that the change could chill reporting because WTCC employees might not feel comfortable raising concerns to WTP ECP personnel who provided oversight, and that the reorganization could undermine the independence of the employee concerns function. She believed that compromising the independence of the ECP could conflict with DOE requirements

and threaten the effective identification and resolution of health, safety, and other employee concerns.

30. Ms. Phillips also escalated her concern in this same time frame to Mr. Rineer and Ms. Miller regarding Mr. Curtis's dismissive response to the September 12, 2023 concerns she and Mr. White had raised.

***Disclosure 4: Spring - October 2023 — Timecard Fraud***

31. Several times during Spring through October 2023, Ms. Phillips openly expressed her concerns regarding timecard fraud and the failure of management to move investigations forward to Brigitte Miller (supervisor, WTCC ECP Manager), Matt Curtis (Bechtel ECP Functional Manager), Rick Holmes (WTCC Site Director), and others. Ms. Phillips also expressed concerns that WTCC ECP supervisors and coordinators are bullied and pressured to “not investigate concerns” by upper management.

32. Throughout the summer of 2023, Ms. Phillips and others at WTCC ECP raised concerns to multiple levels of management, including Mr. Curtis, that senior management (1) attempted to sway WTCC ECP to not investigate Maintenance Composite Crew timecard fraud concerns and (2) failed to move forward corrective actions for a substantiated safety concern within Maintenance Composite Crew.

33. In approximately August through October2023, Ms. Phillips and her supervisor Brigitte Miller (WTCC ECP Manager) investigated and substantiated a case that spanned over a 2-year period involving 800 hours of timecard fraud brought by Tyson Maloney (maintenance employee with Amentum). Mr. Maloney specifically brought a complaint against Amentum management claiming that they were manipulating numbers to fraudulently increase the number of completed maintenance packages. Upon WTCC ECP substantiating the claims, Sandra Fowler requested and received the WTCC ECP investigation and all supporting data on the matter. The case was deliberately stalled by upper management and never sent to DOE OIG. Rather than addressing the timecard fraud scheme set up by Amentum management, upper management focused on the whistleblower and fired Mr. Maloney for timecard fraud.

34. In approximately October 2023, Ms. Phillips spoke with WTCC Site Director Rick Holmes regarding an increase in timecard fraud cases and the hours involved in a timecard fraud investigation she had worked on. During this conversation, Jules Kempf was at her desk and likely heard their discussion.

a. Mr. Holmes stated that WTCC "cannot have any more" of these cases and gave Ms. Phillips the impression that he wanted the processing of such cases to stop.

b. Ms. Phillips informed Mr. Holmes that she would "always report concerns and continue to raise the concerns until someone listened."

c. Mr. Holmes indicated that individuals who discovered potential timecard fraud should bring the matter directly to him and legal counsel rather than process it through WTCC ECP. Ms. Phillips understood this as an effort to divert potential fraud concerns from the established ECP process. She continued to process and raise employee concerns through ECP. Plaintiff does not allege that Mr. Holmes used the precise words of an express order to stop all investigations; rather, she alleges that his comments and the proposed routing of concerns conveyed pressure to curtail ECP’s handling of timecard matters.

**Disclosure 5: October 18, 2023 — Complaints About Mendoza's Investigation Conduct**

35. On or about October 18, 2023, following a second interview by WTP ECP Manager Dan Mendoza and investigator Julie Wetzler, Ms. Phillips spoke with Ms. Miller and Mr. Rineer (in person) and Ms. Fowler (by phone) regarding Mr. Mendoza's conduct during the interview. Ms. Phillips reported that Mr. Mendoza had been unprofessional, harsh, and intimidating, that he repeatedly interrupted her and would not allow her to complete her answers, and that the interview caused her significant distress.

***Additional Protected Activities: Safety Disclosures and ECP Participation***

a. A stalking complaint filed by employee William Hargrow against a co-worker, Michael Schmidt. The complaint was referred to WTP Security, the onsite security organization serving WTCC, and WTP Security substantiated the concern. Ms. Phillips understood that a termination recommendation had been agreed upon, but corrective action was delayed for approximately six weeks. During that period, Mr. Hargrow remained concerned for his safety. The alleged delay occurred while Mr. Schmidt was also the subject of employee concerns being raised to DOE ECP and WTP Security was investigating the stalking complaint. Ms. Phillips understood that WTCC management may have believed it could not take immediate action while those other concerns were pending; she does not allege that management expressly gave her that explanation unless supported by further evidence.

b. A lockout/tagout (“LOTO”) concern in which an employee alleged that he had been instructed to take shortcuts involving electrical equipment. The concern was investigated. The lead investigator later reported that it was determined to be unsubstantiated after the employee paused the work and electricians were engaged to address the potential issue. Ms. Phillips’s concern was that the allegation required appropriate

investigation and attention to worker safety; she does not allege that a LOTO violation was ultimately established.

c. A chilled-work-environment assessment concerning the Bravo crew, conducted by Heather McMurdo, then WTP ECP Manager. Ms. McMurdo undertook the assessment after Brigitte Miller, WTCC ECP Manager, recused herself because her son was a member of the Bravo crew. Ms. Phillips worked directly with Ms. McMurdo and WTCC Site Director Rick Holmes to ensure that Mr. Holmes received Ms. McMurdo's recommendations and to follow up on them. The assessment was reported as unsubstantiated, but recommendations were provided to Mr. Holmes. Ms. Phillips alleges that she participated in communicating and following up on those recommendations; the extent to which specific corrective actions were implemented should be determined from the underlying records.

d. Multiple timecard fraud investigations that WTCC ECP substantiated, in which ECP recommended corrective or disciplinary action. Ms. Phillips alleges that management did not consistently implement or advance the recommendations, including instances in which Labor Relations Manager Larry Brown reversed course or did not implement recommended action.

i. Ms. Phillips reported concerns about delayed or unimplemented safety and corrective-action recommendations to multiple levels of management, including Mr. Holmes, Mr. Curtis, Mr. Rineer, and Ms. Fowler.

ii. At an October 10, 2023 meeting, Deputy Site Manager Bruce Covert questioned whether Ms. Miller's ECP team was qualified to conduct timecard fraud investigations, specifically referencing Ms. Phillips and her time in ECP, despite the team having completed multiple such investigations. Given the timecard fraud matters then being investigated and Ms. Phillips's role in them, she understood the questioning as potentially intimidating and as capable of discouraging ECP personnel from continuing that work. She does not claim to know Mr. Covert's intent.

**D. The Retaliatory Investigation and Termination**

36. On September 5, 2023—one week before Ms. Phillips's September 12 disclosures to Mr. Curtis—Hanford ECP Manager Bonnie Lazor referred two complaints for investigation to WTP ECP Manager Dan Mendoza arising from the Maintenance Composite Crew investigations. These complaints generally alleged that a WTCC ECP employee had been providing information to Mr. Hargrow during investigations. The September 5 referral preceded Ms. Phillips's September

12 disclosures; Plaintiff does not rely on timing alone to establish that Mr. Mendoza knew of the September 12 disclosures when he began his work. Plaintiff alleges that Mr. Mendoza's knowledge, if established, and his subsequent conduct are relevant to the investigation's fairness and potential retaliatory motive.

Mr. Curtis—Mendoza interviewed Ms. Phillips. During the interview, Mr. Mendoza asked whether Ms. Phillips had a "personal relationship" with Mr. Hargrow. Ms. Phillips denied any personal relationship and stated that the question was offensive and inappropriate. On information and belief, Mr. Mendoza became aware of Ms. Phillips's September 12, 2023 disclosures to Mr. Curtis regarding WTP ECP's conduct, including her criticisms of Mr. Mendoza. Plaintiff alleges that Mr. Mendoza's participation in investigating her conduct, after she had raised concerns about his impartiality, created an appearance of bias and a potential conflict that should have been addressed. The precise date and manner in which Mr. Mendoza learned of the September 12 disclosures remain subject to discovery.

Phillips's office at approximately 7:00 a.m. and conducted a second interview. During this interview, Mr. Mendoza was harsh and intimidating, repeatedly interrupted Ms. Phillips, and would not allow her to complete her answers. Mr. Mendoza stated multiple times that he had information which "proved" Ms. Phillips was being untruthful.

37. Mr. Mendoza's investigation findings were referred to Matthew Curtis—the

same Functional Manager to whom Ms. Phillips had made her September 12, 2023 protected disclosures. Mr. Curtis consulted with WTCC management, legal counsel, and Bechtel's Chief Compliance and Ethics Officer, Nina Martin, and decided to terminate Ms. Phillips.

38. On November 1, 2023, Ms. Phillips was summoned from her office while Meeting with an employee who had raised a concern. An HR representative led her away, and Mr. Curtis informed her via teleconference that her employment was being terminated effective immediately.

39. The termination letter, signed by Mr. Curtis, stated that Ms. Phillips had "engaged in inappropriate conversations with a colleague who was involved in a separate ECP investigation, undermining [her] credibility and ethical responsibilities" and that she had not been "forthcoming and misled investigators" during her September 14, 2023 interview.

40. At no point prior to or following her termination was Ms. Phillips provided with any specific evidence supporting the allegations against her. When she contacted Bechtel's Employee Dispute Resolution process, Employee Relations Manager Keryn Rowland concluded that there were "sufficient and reasonable grounds" for termination but provided no details or evidence beyond a copy of the termination letter Ms. Phillips had already received.

**E. Evidence of Pretext and Retaliatory Motive**

41. The following circumstances demonstrate that Defendants' stated reason for terminating Ms. Phillips was pretextual and that the true motivation was retaliation for her protected disclosures:

a. Ms. Phillips was actively engaging in protected disclosures the summer of 2023. On September 12, 2023, Ms. Phillips made significant protected disclosures to Mr. Curtis. Within two days, on September 14, 2023, Mr. Mendoza initiated interviews into her regarding these allegations against her. She was terminated less than seven weeks later on November 1, 2023.

b. The investigation was conducted by Mr. Mendoza, whom Ms. Phillips had specifically criticized in her September 12 disclosures for his oversight of WTCC ECP and whom she believed could not provide unbiased and fair guidance. His role in investigating her conduct, and the timing and extent of his knowledge of her disclosures, raise questions about the investigation's impartiality.

c. Mr. Curtis made or recommended the termination decision despite Ms. Phillips having made her protected disclosures to him and him dismissing her concerns.

d. Labor Relations Manager Larry Brown, about whose handling of ECP

referrals Ms. Phillips had raised concerns, provided Mr. Mendoza with information from Mr. Schumacher that included both Mr. Schumacher's claimed personal observation and statements he attributed to Mr. Hargrow. The statements attributed to Mr. Hargrow were secondhand and should be distinguished from Mr. Schumacher's own observations.

e. Mr. Mendoza's investigation relied in part on statements by Mr. Schumacher about what Mr. Hargrow allegedly told him. Those attributed statements were secondhand and were not direct statements by Mr. Hargrow to Mr. Mendoza. Plaintiff alleges that Mr. Hargrow disputed or denied aspects of the allegations; the precise scope of any denial should be evaluated against the interview record. No specific confidential information allegedly disclosed by Ms. Phillips is identified in the termination letter. Ms. Phillips's phone records, submitted on October 30, showed no contact outside approximately 6:30 a.m. to 5:00 p.m.; the records do not establish the content of the communications. Mr. Mendoza's investigation relied in part on statements by Mr. Schumacher about what Mr. Hargrow allegedly told him. Those attributed statements were not direct statements by Mr. Hargrow to Mr. Mendoza. Plaintiff alleges that Mr. Hargrow disputed or denied aspects of the allegations; the precise scope of any denial should be evaluated against the interview record. No specific confidential information allegedly disclosed by Ms. Phillips is identified in the termination letter. Ms.

Phillips's phone records, submitted on October 30, showed no contact outside approximately 6:30 a.m. to 5:00 p.m.; the records do not establish the content of the communications.

f. WTCC ECP had no formal manual governing investigator communications with employees. As investigator Matkowski stated, "'[it is] not like [they] have an ECP manual,' so there is some variation with regard to how each investigator conducts a case." ECP employees received "on-the-job training" with no specific written protocols for conducting investigations.

g. Mr. Matkowski, a WTCC ECP investigator, stated that he did not recall Ms. Phillips taking inappropriate actions and that her role as ECP Coordinator involved communications with employees raising concerns. Mr. White, the lead investigator on relevant cases, confirmed that Ms. Phillips was assigned to assist with investigations and described her investigative assistance, including one witness interview while he was out of the office. Mr. White also stated that he was unaware of certain communications with Mr. Hargrow. Plaintiff does not characterize Mr. White as having approved or cleared every communication or action. This testimony is relevant context, not a blanket exoneration.

Mr. Hargrow's account and the statements attributed to him should be evaluated against the complete interview record. Plaintiff alleges that information tending to show work-related reasons for the communications and the absence of a specific

identified confidential disclosure was not fairly considered. Mr. White's testimony is as described above; Plaintiff does not allege that he cleared every communication or action. Ms. Phillips had a strong employment record, consistently meeting or exceeding performance expectations, and had never previously received any form of disciplinary action.

h. In January 2024, less than three months after Ms. Phillips's termination, WTCC ECP was dissolved and absorbed into WTP ECP—the very reorganization Ms. Phillips had raised concerns about.

i. Senior management made remarks that Ms. Phillips understood as disparaging or alienating toward WTCC ECP. Mr. Holmes made remarks during All Teams Meetings, including, "Oh no, we all better be good, ECP is here," in front of project employees. Ms. Phillips also attended meetings and was included in email communications in which Ms. McMurdo, Mr. Mendoza, and other senior managers made statements she understood to undermine concerns substantiated by WTCC ECP. Employees told Ms. Phillips that they did not feel their concerns were taken seriously because of senior management's attitude.

## V. <u>FIRST CAUSE OF ACTION: RETALIATION IN VIOLATION OF 31 U.S.C. §3730(h)</u>

42. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 46 as though fully set forth herein.

43. This is a claim against all defendants for retaliation against Plaintiff in violation of 31 U.S.C. § 3730(h).

44. Plaintiff was employed by WTCC, a contractor performing work under a federal contract, and engaged in protected activity when she took lawful steps to investigate, document, report, and help stop conduct she reasonably believed involved fraud against the United States, including potentially false labor-hour or other charges under federally funded contracts. Her protected activity included reporting substantiated timecard fraud, raising concerns that such matters were being suppressed or diverted from ECP, and reporting management conduct that she reasonably believed impeded efforts to stop or address the suspected fraud. Plaintiff alleges that these activities were undertaken, at least in part, to stop violations of the False Claims Act, 31 U.S.C. §§ 3729–3733. The nature of the allegedly false claims, the federal payment connection, and the scope of each Defendant's knowledge are matters to be established through the evidence.

Defendants knew of Ms. Phillips's protected activities, including the reports she made to management and the individuals involved in the investigation and termination decisions.

45. Because Ms. Phillips reported suspected fraud and efforts to suppress or

divert the investigation of that fraud, Defendants subjected her to an investigation and ultimately terminated her employment. Plaintiff alleges that the investigation and termination were retaliatory responses to her protected activity.

46. Because Phillips reported said conflict of interest and unlawful schemes, defendant discriminated against Phillips by putting her under investigation, subjecting her to a hostile work environment, and ultimately terminating her employment.

47. As a direct and proximate result of Defendants' retaliatory conduct, Ms. Phillips has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of career advancement opportunities; emotional distress, humiliation, and damage to her professional reputation; and other consequential damages.

## VI. SECOND CAUSE OF ACTION: WHISTLEBLOWER RETALIATION UNDER 41 U.S.C. § 4712

*(Against All Defendants)*

48. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 46 above.

49. 41 U.S.C. § 4712 provides that an employee of a contractor, subcontractor, grantee, or

sub-grantee may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing information that the employee reasonably believes is evidence of: (a) gross mismanagement of a federal contract or grant; (b) a gross waste of federal funds; (c) an abuse of authority relating to a federal contract or grant; (d) a substantial and specific danger to public health or safety; or (e) a violation of law, rule, or regulation related to a federal contract.

50. At all times relevant hereto, Defendants were contractors and/or subcontractors performing work under contracts funded by the United States Government through the Department of Energy for the construction and operation of the Waste Treatment and Immobilization Plant at the Hanford Site.

51. Ms. Phillips made disclosures that she reasonably believed constituted evidence of:

a. Violation of law, rule, or regulation related to a federal contract: Ms. Phillips disclosed that WTCC General Counsel Sandra Fowler failed to report substantiated findings of waste, fraud, and abuse—including substantiated timecard fraud—to the DOE Office of Inspector General as required by DOE Order 221.1A (detailed above under Disclosure 1) and

    b. Ms. Phillips disclosed that Ms. Fowler intentionally interfered with ECP investigations, instructed managers not to inform the ECP of potential fraud cases, and directed concerns to herself to control

outcomes—in violation of DOE Order 442.1B governing ECP procedures (detailed above under Disclosure 2 and 4).

c. Gross mismanagement of a federal contract: Ms. Phillips disclosed that senior management, including Rick Holmes and Sandra Fowler, systematically undermined the WTCC ECP by failing to implement safety and corrective action recommendations, suppressing the investigation of substantiated concerns, and pressuring ECP employees not to investigate certain matters—all in connection with the management of a multi-billion dollar federal contract for nuclear waste treatment (detailed above under Disclosure 1 and Additional Protected Activities).

d. Gross waste of federal funds: Ms. Phillips disclosed substantiated timecard fraud involving WTCC employees, including one case involving 800-plus hours (detailed above under Disclosure 4). Senior management attempted to suppress investigation of these cases and failed to ensure proper reporting and accountability, resulting in the waste of federal funds (detailed above under Disclosure 1 and Additional Protected Activities).

e. Abuse of authority relating to a federal contract: Ms. Phillips disclosed that senior management, including Mr. Holmes, Ms. Fowler, and Mr. Curtis,

abused their authority by bullying ECP personnel, ignoring substantiated findings, attempting to control the outcome of investigations, and retaliating against ECP employees who performed their duties faithfully (detailed above under Disclosure 1 and 4).

f. Substantial and specific danger to public health or safety: Ms. Phillips Substantial and specific danger to public health or safety: Ms. Phillips disclosed the delay in responding to a stalking complaint that WTP Security substantiated, the LOTO concern involving alleged shortcuts with electrical equipment, and management practices that she reasonably believed undermined the investigation and resolution of employee safety concerns at a nuclear waste treatment facility. The LOTO concern was investigated and reported as unsubstantiated after the employee paused the work and electricians were engaged. Plaintiff alleges that she raised these matters as safety concerns; she does not allege that the LOTO allegation was ultimately established.

52. Ms. Phillips made these disclosures to management officials including Matthew Curtis (Bechtel Ethics and Compliance and ECP Manager), Rick Holmes (WTCC Site Director), Matt Rineer (Bechtel HR Manager), Sandra Fowler (WTCC General Counsel), Larry Brown (WTCC Labor Relations

Manager), April Stephenson (Compliance Auditor), and Brigitte Miller (WTCC ECP Manager).

53. Ms. Phillips's disclosures were a contributing factor in Defendants' decision to terminate her employment on November 1, 2023.

a. Under 41 U.S.C. § 4712(c)(1), having exhausted her administrative remedies or, alternatively, pursuant to 41 U.S.C. § 4712(c)(2), Ms. Phillips brings this action in the appropriate United States District Court.

b. As a direct and proximate result of Defendants' retaliatory conduct, Ms. Phillips has suffered and continues to suffer damages, including but not limited to: loss of past and future wages and benefits; loss of career advancement opportunities; emotional distress, humiliation, and damage to her professional reputation; and other consequential damages.

## VII. THIRD CAUSE OF ACTION: Wrongful Discharge in Violation of Public Policy (Washington State Law)

*(Against All Defendants)*

54. Plaintiff re-alleges and incorporates by reference each of the preceding paragraphs as though fully set forth herein.

55. At all relevant times, the Defendants acted as joint employers. WTCC employed Ms. Phillips and exercised control over the terms and conditions

of her employment. Ms. Phillips most recently served WTCC as WTCC Employee Concerns Program ("ECP") Coordinator at the Hanford Site in Richland, Washington.

56. At all relevant times, Bechtel also employed Ms. Phillips and exercised control over the terms and conditions of her employment, including the decision to terminate it. Matthew Curtis, Bechtel's Manager of Ethics and Compliance and Employee Concerns, served as Ms. Phillips's functional manager, made the decision to terminate her, and signed the November 1, 2023 termination letter on Bechtel letterhead, which stated that "your employment with Bechtel is being terminated effective immediately on November 1, 2023." Bechtel and WTCC were Ms. Phillips's joint employers for purposes of this claim.

57. WTCC was created in 2017 by Bechtel National, Inc. (“Bechtel”) and AECOM Energy & Construction, Inc. and is currently jointly owned by Bechtel and Amentum Holdings, Inc. (“Amentum”). Amentum also performed work at the Hanford Site as a subcontractor to Bechtel. Plaintiff alleges that Amentum’s ownership and contractual arrangements, together with any actual control it exercised over the terms and conditions of her employment, support its inclusion in this action. The nature and extent of

any joint-employer relationship are subject to confirmation through the governing agreements and discovery.

58. Under Washington law, it is a tort to discharge an employee in violation of a clear mandate of public policy. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232 (1984); *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936 (1996).

59. The State of Washington recognizes a clear mandate of public policy protecting employees who report violations of law, safety hazards, and fraud from retaliatory discharge.

60. Washington recognizes a common-law tort claim for wrongful discharge in violation of public policy as an exception to the at-will employment doctrine. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984), *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936 (1996).

61. The tort applies where an employee is discharged (1) for refusing to commit an illegal act; (2) for performing a public duty or obligation; (3) for exercising a legal right or privilege; or (4) in retaliation for reporting employer misconduct. *Suarez v. State*, 3 Wn.3d 404, 430, 552 P.3d 786 (2024); *Martin v. Gonzaga Univ.*, 191 Wn.2d 712, 723, 425 P.3d 837 (2018).

62. Where, as here, a claim falls within one or more of these recognized categories, the plaintiff must show that (1) the public policy is manifested in a constitutional, statutory, or regulatory provision or prior judicial decision, and (2) the employee's conduct associated with that public policy was a significant factor in the decision to discharge the employee. *Suarez*, 3 Wn.3d at 430; *Martin*, 191 Wn.2d at 723. The burden then shifts to the employer to articulate a legitimate, nonpretextual, nonretaliatory reason for the discharge. *Martin*, 191 Wn.2d at 725–26; *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 70, 821 P.2d 18 (1991).

63. The existence of separate statutory or administrative remedies, including those under 41 U.S.C. § 4712 and 10 C.F.R. Part 708, does not bar this claim. *Rose v. Anderson Hay & Grain Co.*, 184 Wn.2d 268, 358 P.3d 1139 (2015); *Becker v. Cmty. Health Sys., Inc.*, 184 Wn.2d 252, 359 P.3d 746 (2015); *Rickman v. Premera Blue Cross*, 184 Wn.2d 300, 358 P.3d 1153 (2015).

64. The following constitutional, statutory, and regulatory provisions establish clear mandates of public policy that prohibit fraud against the United States and its contracts, require the reporting of fraud, waste, and abuse in federally funded programs, protect employees who report such misconduct, and

protect workplace health and safety: Multiple sources of clearly defined public policy support Ms. Phillips's claim, including but not limited to:

a. Federal whistleblower protection statutes, including 41 U.S.C. § 4712, which prohibits employees of federal contractors and subcontractors from being discharged in reprisal for disclosing to a management official or other person with authority to investigate misconduct information the employee reasonably believes is evidence of gross mismanagement of a federal contract, a gross waste of federal funds, an abuse of authority relating to a federal contract, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal contract;

b. DOE regulations, including 10 C.F.R. § 708.5, which prohibits DOE contractors from retaliating against employees who disclose information they reasonably believe reveals a substantial violation of a law, rule, or regulation; a substantial and specific danger to employees or to public health or safety; or fraud, gross mismanagement, gross waste of funds, or abuse of authority. DOE regulations also establish the Contractor Employee Protection Program specifically to encourage and protect employees who disclose information about unsafe, illegal, fraudulent, or wasteful practices at DOE facilities.

c. The False Claims Act, 31 U.S.C. §§ 3729–3733, which prohibits knowingly presenting false or fraudulent claims for payment to the United States, including false charges for labor hours billed under federal contracts, and 31 U.S.C. § 3730(h), which prohibits retaliation against employees for lawful acts taken in furtherance of efforts to stop such violations;

d. 18 U.S.C. §§ 287 and 1001, which criminalize false, fictitious, or fraudulent claims against, and false statements to, the United States;

e. The Atomic Energy Act, 42 U.S.C. § 2011 et seq., and the federal nuclear safety requirements, rules, regulations, orders and guidances, implemented under it, which reflect the vital public interest in the safe design, construction, and operation of nuclear facilities such as the Hanford Tank Waste Treatment and Immobilization Plant, and in protecting workers and the public from radiological and chemical hazards. These reflect the vital public interest in ensuring the safety of nuclear facilities and the protection of workers and the public from radiological and chemical hazards.

f. Washington State public policy favoring the reporting of workplace safety hazards and fraud and protecting employees who participate in

safety-related reporting and investigations. Washington courts have consistently recognized that terminating employees for performing important public duties or reporting legal violations contravenes clear mandates of public policy.

65. These public policies are further implemented at DOE facilities through DOE Order 221.1A (Reporting Fraud, Waste, and Abuse to the Office of Inspector General), which requires DOE contractors to report information about possible fraud, waste, and abuse to the DOE Office of Inspector General, and DOE Order 442.1B (Department of Energy Employee Concerns Program), which establishes the Employee Concerns Program to ensure that concerns about waste, fraud, abuse, and safety are raised and resolved. These requirements are incorporated into Defendants' contracts with DOE and were binding on Defendants at all relevant times.

66. Ms. Phillips was terminated for reasons that were in violation of these public policies, including performing her duties as ECP Coordinator—a position specifically created to implement the public policy goals of the DOE Contractor Employee Protection Program—and for making disclosures that she reasonably believed reported violations of law, fraud, waste, abuse, and threats to safety at a nuclear waste treatment facility.

67. Plaintiff reported employer misconduct. Ms. Phillips reported conduct by Defendants' managers that she reasonably and in good faith believed violated the public policies set forth above, including by:

a. Reporting verbally to Compliance Auditor April Stephenson, in or about June through August 2023, that employee concerns alleging waste, fraud, and abuse had been substantiated by the ECP but had not been reported to the DOE Office of Inspector General as required;

b. Reporting to Mr. Curtis, verbally and in writing on September 12, 2023 (including in a written document titled "Concerns Regarding Interference with WTCC ECP" and follow-up emails), that WTCC General Counsel Sandra Fowler was intentionally interfering with ECP investigations and failing to report employee concerns about waste, fraud, and abuse to the DOE Office of Inspector General, including by instructing managers and Human Resources not to inform the ECP of a potential timecard fraud case; directing concerns to herself to control outcomes; causing draft ECP investigation reports to be sent to implicated parties' management chains without a need to know; and retaining outside legal teams to re-review an already completed and substantiated timecard fraud investigation involving more than 800 hours;

c. Reporting to Mr. Curtis on September 12, 2023, that a WTP manager had presented false information to senior WTP leadership and DOE officials concerning ECP's handling of employee concerns, had conducted follow-up interviews that subjected at least one employee to retaliation and interfered with ongoing ECP investigations, and had asked the WTP Security Manager to notify her whenever the ECP investigated contracted security officers;

d. Reporting to Defendants' management that substantiated timecard fraud findings were not being acted upon, and that senior management was pressuring ECP personnel not to investigate certain concerns;

e. Reporting to Defendants’ management, including Mr. Holmes, Mr. Curtis, Mr. Rineer, and Ms. Fowler, that WTP Security had substantiated a stalking complaint and that corrective action had been delayed for approximately six weeks, as well as raising a separate LOTO safety concern involving alleged shortcuts with electrical equipment. Plaintiff acknowledges that the LOTO concern was later reported as unsubstantiated after the work was paused and electricians were engaged; and

f. Raising concerns on October 10, 2023, and thereafter that timecard fraud cases had not been reported to the DOE Office of Inspector General in compliance with required protocols.

68. Plaintiff alleges, in the alternative, that management’s statements and proposed routing of potential timecard fraud matters pressured her to divert or suppress concerns that should have been processed through ECP. She continued to raise and process those concerns. Plaintiff does not allege that Mr. Holmes expressly ordered her to commit an illegal act; whether these facts support a separate refusal-to-commit-an-illegal-act theory is a question for counsel.

69. Plaintiff performed a public duty. As WTCC ECP Coordinator, Ms. Phillips carried out functions required by DOE Order 442.1B and the public policies described above, including receiving and processing employee concerns about fraud, waste, abuse, and safety at a federal nuclear facility. Her insistence on processing, documenting, and escalating those concerns rather than allowing them to be suppressed constituted performance of a public duty.

70. Ms. Phillips's reports were directed to persons with authority to investigate and correct the misconduct, including Bechtel's Manager of Ethics and Compliance and Employee Concerns, a Compliance Auditor, the WTCC Site Director, Human Resources, and General Counsel.

76. Ms. Phillips was engaged in conduct directly related to the public policies at issue, namely investigating and reporting employee safety concerns,

fraud, and violations of DOE regulations and orders at a nuclear waste treatment facility operated with federal funds.

77. The public policy-linked conduct was a significant factor in Defendants' decision to terminate Ms. Phillips's employment.

Defendants knew of Ms. Phillips's protected conduct. Mr. Curtis personally received her September 12, 2023 written and verbal reports. The September 5 referral to Mr. Mendoza preceded those reports; Plaintiff alleges that the subsequent timing, the identity of the investigator she had criticized, and evidence concerning when he learned of her reports support further inquiry into whether the investigation was affected by her protected disclosures.

79. Two days after Ms. Phillips made her September 12, 2023 reports to Mr. Curtis, WTP ECP Manager Dan Mendoza, whom Ms. Phillips had identified in those reports as unable to provide unbiased oversight, interviewed her on September 14, 2023, in an investigation directed at her.

80. On October 18, 2023, Ms. Phillips complained to Ms. Miller, Mr. Rineer, and Ms. Fowler about Mr. Mendoza's conduct during his interviews of her.

81. On November 1, 2023, less than seven weeks after her September 12, 2023 reports and two weeks after her October 18, 2023 complaints, Defendants summoned Ms. Phillips from her office while she was meeting with an employee who had raised a concern and terminated her employment effective immediately.

82. Mr. Curtis made the termination decision after consulting with WTCC management, legal counsel, and Bechtel's Chief Compliance and Ethics Officer, Nina Martin, including managers whose conduct Ms. Phillips had reported.

83. The close temporal proximity between Ms. Phillips's protected conduct and her discharge; the decision-maker's direct knowledge of that conduct; the involvement of managers whose conduct she had reported; the commencement of an investigation of Ms. Phillips within days of reporting, led by a manager she had criticized; and senior management's expressed desire to curtail timecard fraud cases, all demonstrate that Ms. Phillips's protected conduct was a significant factor in Defendants' decision to discharge her.

84. Defendants terminated Ms. Phillips's employment in contravention of these clear mandates of public policy. Defendants' termination letter asserted that Ms. Phillips had "engaged in inappropriate conversations with a colleague who was involved in a separate ECP investigation," had "breached the confidentiality of an investigation," and had not been forthcoming with and misled investigators during her September 14, 2023 interview.

85. These reasons are pretextual and are not the true reasons for Ms. Phillips's discharge. Among other things, the investigation on which they rest was initiated two days after her reports, was conducted by a manager she had identified

as biased, and was followed by discharge rather than lesser discipline, notwithstanding Ms. Phillips's employment history since January 2019.

Defendants cannot demonstrate an overriding business justification for the termination that is sufficient to override the public policy concern. Plaintiff alleges that the stated reason is pretextual based on the circumstances described above, including the timing and impartiality concerns surrounding the investigation; the distinction between Mr. Schumacher's personal observations and secondhand statements attributed to Mr. Hargrow; the absence of an identified specific confidential item in the termination letter; the phone records submitted on October 30 and the lack of any communicated review of those records; the testimony of Mr. Matkowski that he did not recall inappropriate actions; Mr. White's testimony that Ms. Phillips was assigned to assist with investigations and conducted one interview while he was out of the office, while also acknowledging that he was unaware of certain communications with Mr. Hargrow; Ms. Phillips's positive employment history and lack of prior discipline; and the January 2024 dissolution of WTCC ECP and absorption of its functions into WTP ECP, the reorganization about which Ms. Phillips had raised concerns. Plaintiff does not presently allege comparator evidence because no specific comparator facts have been identified.

87. In the alternative, and to the extent the Court applies the four-part framework described in *Gardner v. Loomis Armored Inc.*, 128 Wn.2d 931, 941,

913 P.2d 377 (1996), and *Rose*, 184 Wn.2d at 277: (a) the public policies identified above are clear; (b) discouraging Ms. Phillips's conduct would jeopardize those policies, because her conduct directly related to and was necessary for their effective enforcement. Internal reporting through the ECP and to responsible management was the mechanism DOE established for surfacing fraud, waste, abuse, and safety concerns at the facility, and firing the ECP Coordinator who insisted on reporting them would discourage every other employee at the facility from raising such concerns; (c) the public-policy-linked conduct caused her dismissal; and (d) Defendants have no overriding justification for the discharge.

88. Nothing precludes this claim. No prior decisions have addressed whether Ms. Phillips's conduct was associated with the Washington public policies alleged here, or the False Claims Act, 18 U.S.C. §§ 287 and 1001, or RCW 49.17.160 or causation. The parties have not conducted formal discovery before.

## VIII. DAMAGES

As a direct and proximate result of Defendants' retaliatory and wrongful conduct, Ms. Phillips has suffered and continues to suffer damages, including lost wages and employment benefits; lost earning capacity and employment opportunities; loss of retirement contributions and other compensation, to the extent supported by proof; emotional distress, mental anguish, humiliation, and injury to reputation, to the extent recoverable under the applicable claims;

reasonable job-search expenses and other documented out-of-pocket losses; and attorneys' fees, costs, and expert fees where authorized by statute or other applicable law. Plaintiff seeks the remedies available under each cause of action, without duplicative recovery.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Hayley Phillips respectfully prays for judgment against Defendants as follows:

A. A declaration that Defendants violated 41 U.S.C. § 4712 by retaliating against Plaintiff for making protected disclosures;

B. A declaration that Defendants wrongfully discharged Plaintiff in violation of the public policy of the State of Washington;

C. A declaration that Defendants violated the False Claims Act, 31 U.S.C. § 3730(h);

D. Reinstatement to her former position or a substantially equivalent position, or, in the alternative, front pay in lieu of reinstatement, as authorized by applicable law;

E. Back pay, including lost wages, salary, bonuses, benefits, and retirement contributions, together with any statutory enhancement, including double back

pay under 31 U.S.C. § 3730(h) if that claim is established, and prejudgment interest where authorized;

F. Compensatory damages for emotional distress, mental anguish, humiliation, loss of reputation, and other non-economic losses, to the extent recoverable under the applicable claims;

G. Special and other compensatory damages, including documented job-search expenses, relocation expenses, medical expenses, and other out-of-pocket losses, to the extent recoverable;

H. Reasonable attorneys' fees, litigation costs, and expert fees where authorized by 41 U.S.C. § 4712, 31 U.S.C. § 3730(h), or other applicable state or federal law;

I. Such punitive or exemplary damages, if any, as are legally available and supported under an applicable cause of action;

J. Prejudgment and post-judgment interest as authorized by law;

K. Such other and further relief as this Court deems just, equitable, and proper.

## X. JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED this 30th day of October, 2026.

Respectfully submitted,

___s/Stephani L. Ayers_________________________________

Stephani L. Ayers

Britaney Lindley

*Attorneys for Plaintiff Hayley Phillips*